## In re Mount Royal Associates

*Patrick McGinley,* for Commonwealth.
*Robert Sable,* for defendant.

WATERS, Member, January 25, 1974.—This is a matter that comes before the board as a complaint for the imposition of civil penalty under the Clean Streams Law of June 22, 1937, P. L. 1987, as amended, 35 PS §691.1 et seq.

Defendant, Mt. Royal Associates (hereinafter "Mt. Royal"), is alleged to have improperly hooked up its newly constructed 100-unit apartment building, Mt. Royal Towers, to a storm sewer in the City of Pittsburgh, rather than to the sewer line some distance away. The Department of Environmental Resources (hereinafter "department"), contended that raw sewage was, therefore, being discharged to a stream known as Nine Mile Run, which is a tributary to the Monongahela River. The improper connection and the discharge were corrected some 11 months after its discovery, but it is argued that this delay was inordinate and intentional, calling for substantial penalties.

## FINDINGS OF FACT

1. Plaintiff herein is the Commonwealth of Pennsylvania, Department of Environmental Resources, on petition for civil penalties.

2. Defendant is Mt. Royal Associates, a limited partnership.

3. Mt. Royal owns a 100-unit apartment complex located on Forward Avenue in the City of Pittsburgh.

4. On January 3, 1972, signs of a raw sewage discharge into Nine Mile Run were observed by John Hulsberg, an employe at the Allegheny County Health Department.

5. John Hulsberg made a dye test at Mt. Royal on January 5, 1972; the result showed that raw sewage from the building was being discharged into Nine Mile Run.

6. A violation notice was sent to defendant on January 7, 1972, notifying them that they were violating the law and requesting that they limit further occupancy of the building until the sewage discharge could be abated.

7. The discharge of raw sewage from Mt. Royal into Nine Mile Run created a potential health hazard.

8. Repeated observations of Nine Mile Run below the point of discharge by County Health Department personnel revealed fecal matter, toilet paper, and other general signs of raw sewage discharge these signs were also observed from the point of discharge to the stream mouth, a distance of approximately 800 to 900 yards.

9. It was agreed at a March 7, 1972, meeting attended by Mt. Royal, the City, County and department that:

A. The city would recommend to the parties alternative means by which Mt. Royal's sewage discharge

could be abated by tapping the apartment's sewer line into a city sanitary sewer.

B. Mt. Royal was to notify the parties of its legal position with regard to the entire matter.

10. The city communicated its recommendations to the parties pursuant to the March 7, 1972, agree-ment, but Mt. Royal did not fulfill its promise to apprise the parties of its legal position.

11. The city in a letter of March 17, 1972, made the following recommendations for abating Mt. Royal's discharge into Nine Mile Run.

"Our recommendations, not necessarily in order of preference are:

"A. Connect the sanitary sewage plumbing of the apartments into the existing manhole of the 15″ city sewer from Mt. Royal Boulevard which is about 100 feet from the apartment building. However, this sewer will only be able to serve the upper nine floors of the apartment by gravity flow and will necessitate the installation of a pump to serve the remaining lower floors.

"B. Construct a new sanitary sewer from a point on the present apartment sewer on the south edge of Forward Avenue westwardly to the existing 24″ city sewer at the east portal of the Squirrel Hill Tunnels. This would permit the entire apartment sanitary sew-age flow to be served by gravity and would involve the installation of approximately 700 feet of sanitary sewer over city and privately owned property. An easement and ordinance permitting this installation would be necessary.

"C. Construct a new sanitary sewer from a point on the present apartment sewer directly ahead of its entry into the Penn DOT storm sewer manhole off the north berm of the Parkway to the existing 54″ city sewer along the east bank of Nine Mile Run beneath

the Parkway bridge. This would permit the entire apartment sanitary sewage flow to be served by gravity and would involve the installation of approximately 550 feet of sanitary sewer over privately owned property. It would also involve the crossing of Nine Mile Run for which a Pennsylvania Department of Environmental Resources stream crossing permit would be required. An easement and an ordinance permitting this installation would be necessary."

12. The Commonwealth and county filed an equity action in the latter part of May 1972, seeking to enjoin Mt. Royal from violating the Clean Streams Law.

13. Donald Bierwerth, consulting engineer for Mt. Royal, testified that as an expert and as a disinterested engineer, the city's alternative (a), a force main pump station, and the method ultimately selected, was the best available means to abate the sewage discharge, rather than alternative (c), which was selected by Mt. Royal.

14. By the end of August 1972, the county and the Commonwealth noted Mt. Royal's violation of the preliminary consent decree which had been entered on June 28, 1972, and sought to further review the matter before the Court of Common Pleas.

15. On August 31, 1972, the parties to the preliminary consent order entered into a second consent agreement referred to as the interim consent order.

16. Mt. Royal failed to comply with the major portions of the provisions of the interim consent order in that:

A. Mt. Royal again failed to provide the court, the Commonwealth and the county with the tenant list.

B. Mt. Royal failed to apply to the county and Commonwealth by September 1, 1972, for the permits to connect its existing sewer discharge pipe to the city's 54-inch sanitary sewer. Such connection was an integral part of alternative (c) which had been chosen

by Mt. Royal from the three alternatives advanced by the city.

C. Mt. Royal failed to submit by September 1, 1972, all necessary engineering plans and diagrams to the Commonwealth's Department of Environmental Resources for obtaining a stream crossing permit for the encroachment into Nine Mile Run necessary under alternative (c).

D. Mt. Royal failed to submit a written report to the city and county on the status of the right-of-way negotiations it had allegedly been engaged in with the Irish Center of Pittsburgh and Duquesne Slag Products Company.

17. By the middle of September 1972, the Commonwealth noted that most of the provisions of the interim consent order which were to have been completed by September 1, 1972, had not been complied with.

18. The attorney for Mt. Royal stated for the purposes of the several consent orders that 91 apartments were rented and/or occupied on June 22, 1972, and nine apartments were not rented or occupied.

19. The leases subpoenaed by plaintiff, Commonwealth of Pennsylvania, and entered into the record as department Exhibit K, reveal that the rental price of an apartment at Mt. Royal Towers is anywhere from $200 to $225 for one bedroom apartments and from $250 to $325 for two bedroom apartments.

20. Although Mt. Royal witnesses claimed that they were doing everything possible to obtain easements, Mt. Royal never notified the court or the Commonwealth and county that Duquesne Slag Products Company and the Irish Center were very difficult to deal with—such notification would have been grounds for modification in Mt. Royal's favor of the time deadlines in the various consent orders.

21. Mt. Royal discharged raw sewage from the

building into Nine Mile Run continuously from January 3, 1972, until December 18, 1972.

22. Mt. Royal failed to fully commit itself to and institute a positive plan for abatement from January 1972, until October 1972, when the department and county threatened to seek a court order for evacuation of the building until the discharge could be abated.

23. The discharge of raw sewage from the Mt. Royal Towers apartment complex could have been abated in less time had Mt. Royal proceeded diligently.

24. The Commonwealth and county expended a substantial amount of time and effort in investigating and achieving abatement of Mt. Royal's raw sewage discharge.

25. Mt. Royal failed to make full disclosure to the Court of Common Pleas of Allegheny County concerning the extent of occupancy of the building. Such misrepresentations were intended to avoid the provisions of the consent agreements, the purpose of which was to limit the volume of raw sewage discharge and thus limit potential health hazards and pollution of waters of the Commonwealth.

26. Mt. Royal's discharge of raw sewage into Nine Mile Run was not permitted or otherwise authorized by the department and was thus violative of section 201 and 202 of the Clean Streams Law of June 22, 1937, P. L. 1987, 35 PS §619.201, 202.

27. Donald Bierwerth, the engineer from Mt. Royal Associates, was qualified to select the site for the original sewer installation.

28. The engineer employed by Mt. Royal thought that he was tapping into a combination sewer.

29. The City of Pittsburgh enacted an ordinance approving the connection of Mt. Royal's sanitary sewer at the location where the sewer was installed.

30. The drawings showing the proper location of

the sewers were not in the records of the City of Pittsburgh at the time that the original sewer installation was proposed and installed.

31. The location and installation of the Mt. Royal sanitary sewer was pursuant to instructions of an official of the City of Pittsburgh and after review of the maps of the City of Pittsburgh and consultation by Bierwerth.

32. Representatives of Mt. Royal Towers at all times stated that they intended to fix the sewage discharge problem.

33. Mt. Royal Associates proposed a fourth alternative for abating the sewage discharge at Mt. Royal Towers which proposal was rejected by the Commonwealth on April 17, 1972.

34. The City of Pittsburgh originally rejected the proposal for a pumping system at Mt. Royal Towers and in October of 1972 approved it.

35. Reports of negotiations with the two private land owners were made to the court in August 1972.

36. The installation of the pumping system was complex and took approximately seven weeks with two shifts a day with three to nine men.

37. Work on the construction of the pumping station to change the sewage disposal from Mt. Royal Towers began on October 30, 1972.

38. The sewage discharge from Mt. Royal Towers began to flow through the pumping system into the City of Pittsburgh sewer lines on December 18, 1972.

39. Nine Mile Run is an urban stream and not a fresh water brook and is subject to a regular storm water overflow from combined sewers and several sewage breaks.

40. In October 1971, there was an extremely large break in the City of Pittsburgh's 48-inch combination sewer which continued until January or February 1972

and which caused sewage from thousands of homes to flow into Nine Mile Run.

41. A combination sewer is a sewer that carries sanitary waste and, in addition, also drains surface water out of drainage areas that it serves. The 48-inch sewer in question serves a large area of the Borough of Wilkinsburg, the Fern Hollow area, and the eastern end of the City of Pittsburgh.

42. Sewage enters Nine Mile Run also at least several dozen times a year from rain flowing through combination sewers and sewer breaks.

43. There was no testimony as to actual impairment of health to anyone as a result of the sewage discharge from Mt. Royal Towers.

### CONCLUSIONS OF LAW

1. The board has jurisdiction of the parties and subject matter of this civil penalty complaint.

2. Defendant Mt. Royal Associates has violated section 201 and 202 of the Clean Streams Law of June 22, 1937, P. L. 1987, 35 PS §691.201, 202.

3. Civil penalties in the maximum amount of $10,000 for the first day of violation and $500 for each additional day of violation may properly be imposed for the entire period (January 3, 1972—December 18, 1972) that Mt. Royal permitted the continued discharge of raw sewage into Nine Mile Run.

### DISCUSSION

There is no doubt that all of the blame for what happened to bring these proceedings to this point in time cannot be placed on any one party. Defendant, Mt. Royal, is the first to admit that it made an improper connection after efforts were made to obtain the necessary sewer line information from the City of Pittsburgh. Whether it was negligent in not going further than it did in trying to ascertain the correct

hook-up point is still, in my mind, open to question. What is clear, however, is that it was not so wanton or reckless an act as to be considered a willful violation of the Clean Streams Law.

There would seem to be generally three categories of civil penalties as I view the possibilities.

1. The first is nominal, i.e., a penalty in name only, and so small an amount as to imply no more than a technical violation. Of course, all things being relative, what is nominal to one party might throw another into bankruptcy. For clarity, I refer generally to amounts of $500 or less.

2. The next penalty category from $500 to $10,000, would seem to cover a large number of the civil penalty cases expected to occur under normal circumstances. Where there is real but not overwhelming damage and corrective measures are being taken or have been taken, and there is no continuing pollution problem, this would be the category involved.

3. Finally, some cases because of the nature of the damage, the type of defendant and the poor attitude displayed, may call for a severe civil penalty above $10,000 and, indeed, up to $500 per day.

This rule of thumb may be deceptive, because we can never know in advance how the various factors will work in a specific factual situation until case by case, it is before us. The daily assessment will be used mainly as a method of abating pollution of a continuing nature at the time of the order.

Weighing the initial error in hook-up and considering the potential harm, the delay and all of the causes thereof, the costs (on both sides) in effecting a solution, the attitude displayed by defendant throughout and the actual harm caused, we conclude that this case falls squarely within the second category.

We, therefore, enter the following

## ORDER

And now, January 25, 1974, it is ordered that defendant pay $5,500 as a civil penalty into the Clean Streams Fund. The Prothonotary of Allegheny County is hereby ordered to enter their penalty as a lien against any property of the aforesaid defendant, Mt. Royal Associates, with interest at the rate of six percent per annum from the date hereof. No costs may be assessed upon the Commonwealth for entry of the lien on the docket.